1
2
3
4
5
6

7               **UNITED STATES DISTRICT COURT**

8                 EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10   JUAN ESPINOZA, PAUL MARQUEZ, AARON EPPERLY and ERIC SCHMIDT, | Case No. 1:07-cv-01145-SMS |
| 11         Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION** |
| 12 | |
| 13     v. | |
| 14   COUNTY OF FRESNO, | |
| 15         Defendant. | |

16

17          Plaintiffs are deputy sheriffs with the Fresno County Sheriff's Department. They pursue this

18   collective action against the County of Fresno under the Fair Labor Standards Act, 29 U.S.C. §§

19   201-19 (2012) (FLSA), alleging that they were not compensated for overtime required of them by

20   the County. On August 3, 2011, the Court granted summary judgment for Defendant on the claims

21   relating to donning and doffing; commute time; vehicle maintenance; and meal breaks. Doc. 156.

22   The surviving claims are for (1) maintenance of uniforms; (2) maintenance of safety equipment; (3)

23   maintenance of firearms (which Defendant subdivides into quarterly and more-than-quarterly); and

24   (4) qualifying of firearms. Doc. 169.

25          Before the Court is Defendant's motion to decertify the collective action pursuant to 29

26   U.S.C. § 216(b). The issue presented is whether Plaintiffs are "similarly situated," such that the four

27   named Plaintiffs may testify representatively for the additional 200 sheriff's deputies who have

28   opted into this suit. 29 U.S.C. § 216(b); Henderson Decl. ¶2-3; George Decl. ¶4.

The Court finds that Plaintiffs are not similarly situated with respect to their remaining claims. These arise out of disparate factual and employment settings, rebutting them will require individual defenses, and the interests of justice and judicial efficiency will be frustrated if these claims proceed on a collective basis. Accordingly, Defendant's motion to decertify the collective action is GRANTED in full.

## I.     Factual Background

The Fresno County Sheriff's Department has approximately 1,000 employees, of whom approximately 380 are deputy sheriffs. Mims Decl. ¶3. The bureaus relevant to this action are the Patrol Bureau, the Detective Bureau, and the Court and Administrative Services Bureau. *Id.*

Under Defendant's written overtime policy, overtime is only to be used when reasonably necessary for: (1) special assignments; (2) emergency situations; (3) casual overtime with prior approval; and (4) administrative overtime with prior approval. Fresno County Sheriff's Department Policies and Procedures ("P&P") No. 604. Under this policy, overtime must generally be pre-authorized by a supervisor. *Id.* Further, it is the deputy's responsibility to report all hours actually worked, including overtime. *Id.* Sheriff's Department employees are encouraged to complete their tasks within the hours provided during their regularly scheduled shifts; unnecessary overtime is to be avoided. Mims Decl. ¶6.

### A.     Duty Weapon Qualification

Defendant requires its deputies to qualify their duty weapons quarterly. Mims Decl. ¶9, Ex. B. As part of weapons qualifications, deputies perform a shooting test. Mims Depo. 84:12-16; Bewley Depo. 53:18-54:3. If the deputy passes, she is released to clean her weapon. Mims Depo. 86:18-20; Broughton Depo. 29:19- 21; Deimerly Depo. 124:10-15; Epperly Depo. 26:8-18; Espinoza Depo 37:13-15. If the deputy fails, she is provided on-the-spot training and then given another opportunity to qualify. Mims Depo. 84:17-23.

Defendant instructs deputies to schedule these weapons qualifications during on-duty time. Bewley Depo. 54:7-9; Broughton Depo. 29:12-21; Capriola Depo. 82:1-5. There is on-duty time to qualify and clean, whenever deputies can "fit it in." Schmidt Depo. 42:01-43:2. For a variety of reasons, however, deputies' assignments sometimes prevent them from doing so. The procedure

varies slightly between patrol deputies and courtroom deputies. Patrol deputies are apparently assigned a day to qualify. Espinoza Dep. 47:12-21. Deputy Espinoza, who has been a patrol deputy in the past, sometimes had difficulty qualifying on his assigned day. This could be due to his working a graveyard or swing shift, shortages of manpower, or calls for service. *Id.* By contrast, courtroom deputies are not assigned a day for qualifying, but are responsible to find time to qualify and to arrange for another deputy to cover their duties while they qualify. Marquez Depo. 30:13-19; Deimerly Depo. 117:20-118:3. Deputy Marquez, a courtroom deputy, states that it is nevertheless hard for him to find time to qualify during the workday. Although he has qualified during the workday, he points to short-staffing in the courts as a reason why, on two or three occasions, "there was no way to get off" and he had to qualify after hours. Marquez Depo. 31:8-12.

Technically, Defendant's written policies allow for weapons qualification to be done on overtime. Under the written overtime policy for "other necessary activities," if a deputy's schedule is such that she legitimately cannot qualify during her shift, she may do so on overtime if she receives supervisor approval.[1] This policy gives complete discretion to supervisors, and Defendant is vague as to how its supervisors exercise that discretion. Defendant does not "generally" approve overtime for qualifying. Horton Depo. (Vol. II) at 243:25-244:2. However, requests are approved on a "case-by-case basis" depending on the reason for the request; there have been "people" for whom this has been permitted "in the past." Mims Decl. ¶10; Horton Depo. Vol. 2, 246:14-16; Dadian Depo. 74:17-75:9. Also, Defendant is vague as to how supervisors communicate to deputies how they will exercise that discretion. According to one captain, this communication is informal; deputies must ask their sergeant, or learn through time, experience, and training, or "basically know." Horton Depo. Vol. 2, 246:4-14.

Plaintiffs point to evidence that, in fact, supervisors are denying overtime for weapons maintenance across-the-board. Sergeant Frances Devins was heard instructing courtroom deputies that "overtime is not authorized for [firearms] qualifications." Deimerly Depo., 116:18-21. The lead range master, Vincent Frascona, "estimate[s] that at least 20-30 Deputies per quarter show up on

---

[1] A nearby policy for "range and other training" may have the same import. However, it is ambiguous whether weapon qualification counts as "training." As the two policies are otherwise identical, the court views the "other necessary activities" policy as controlling.

their own time (off-the-clock) for their quarterly qualification procedure." Frascona Decl. ¶5. Frascona states that this fact is known to the "prior and current" Lieutenants who have responsibility for the range, meaning at least the current Lieutenant and his predecessor. *Id*.[2] Frascona shared his estimate with Neil Dadian, now a Captain, who at that time was the Lieutenant responsible for the shooting range. In speaking with Dadian, Frascona specifically raised "the question of officers qualifying off-duty and concerns I had about that process." According to Frascona, Dadian responded with words to the effect that, "[I]f that's what they want to do we don't have a problem with it as long as they don't put in for overtime." Frascona Decl. ¶5. Frascona's declaration thus suggests that now-Captain Dadian has been informed of the rate of overtime qualification. And (notwithstanding Defendant's view that Captain Dadian was only referring to deputies who "want to" qualify off-duty) Frascona's declaration also suggests that Captain Dadian believes that overtime should not be paid for after-hours weapons maintenance.[3]

Out of the ten Plaintiffs deposed, three testified that they qualified their duty weapons exclusively on County time. Schmidt Depo. 42: 10-43:2; Fullenkamp Depo. 75:16-76:18; Bewley Depo. 51:25-55:14. Three qualified off-duty, but did so out of personal preference. Broughton Depo. 32: 12-20; Epperly Depo. 6 24:18-26:1; Richardson Depo. 66:14-68:19. The remaining four deputies qualified off-duty because they felt they had to. The common and prominent reason that they each provide is that they were unable to obtain relief, which they attributed to a shortage of manpower. Marquez Depo. 30:25-31: 17; Espinoza Depo. 47:7-25; Deimerly Depo. 114:25-115: 13; Capriola Depo. 81:21-13 82:20. Out of 196 total non-representative Plaintiff's declarations, 122 (or 63%) make no claim for off-the-clock weapons qualification. Of those who do, 34 (or 43% of the total sample) qualified off-the-clock three or fewer times during the four-year period covered by the declarations, or less than once per year. Littlewood Decl. ¶27.

Defendant points out that the deputies who are now suing to be compensated for off-duty weapons qualification did not previously submit this work in their timesheets. Plaintiffs counter that requesting overtime for this activity would have been a futile exercise. For example, Deputy Marquez stated that although he never explicitly sought or was told not to seek overtime, "[i]t was

---

[2] Defendant objects to this evidence from Frascona Decl. ¶5. This evidence is admissible.
[3] Defendant objects to evidence from Schmidt Decl. ¶6. This evidence is inadmissible. It is vague and lacks foundation.

just something we knew we wouldn't get paid to do. I wouldn't even ask for it." Marquez Depo. 30:4-32:19. Deputy Deimerly stated that he recalled hearing from someone that he could not receive overtime for qualifying, though he could not remember who that person was. Deimerly Depo. 115:19-25.

**B.      Duty Weapon Cleaning—Quarterly**

Immediately after a deputy qualifies his weapon, he is required to clean his weapon. Mims Decl. ¶18. A deputy is thus explicitly required to clean his weapon four times a year.

To the extent that the deputy has qualified his weapon on County time, this postqualification cleaning is also done on County time. Bewley Depo. 54:21-55:4; 55:11-14; Broughton Depo. 29:12-21; Dadian Depo. 69:22-25. Conversely, when a deputy does his quarterly qualification off-the-clock, he does his quarterly cleaning off-the-clock. Plaintiffs seek compensation for any quarterly weapon cleaning done off-the-clock.

**C.      Duty Weapon Cleaning—More Than Quarterly**

Defendant does not have a policy requiring deputies to clean their weapons at times other than in connection with their quarterly qualifications. Frascona Decl. 2:8-10. However, Defendant requires that officers maintain their firearms in a fully operational condition. P&P No. 308 III(C). The lubricants in weapons tend to attract dirt, and Plaintiffs state that it is "frequently necessary" to clean their weapons more than every three months. Torres Decl. ¶9.[4]

Nevertheless, deputies' cleaning regimens vary widely, based on the deputy's geographic location, assignment, and extraordinary events that may occur. Deputies working in more rural areas of Fresno County will be exposed to additional dirt, mud, and dust. Torres Decl. ¶9. When indoors, the gun and its lubricants can attract clothing fibers. *Id.* Detectives are frequently called upon to execute search warrants, which may expose their weapons to dirt or dust. *Id.* A former patrol deputy explained that he would clean his weapon whenever there was some extraordinary circumstance where his weapon was exposed to dirt. "If you're chasing somebody through a vineyard in Fresno, that dust goes everywhere." Bewley Depo. 55:18-56-7. Another patrol deputy would clean his

---

[4] Defendant objects to this evidence from Torres Decl. ¶9. This evidence is admissible.

1    weapon whenever a call for service exposed him to dirt, sand, mud, rain, or snow, such that his

2    weapon became dirty. Richardson Depo. 69:5-12, 69:21-70:6.

3        Frequency of cleaning also varies among deputies. One detective cleans his weapon eight

4    times beyond the quarterly cleanings. Torres Decl. ¶9. Another deputy, assigned to patrol, cleans his

5    handgun approximately sixteen times per year (not including the quarterly cleanings), plus two light

6    cleanings per week for dust and dirt. Another patrol deputy cleans his weapon twenty times beyond

7    the quarterly cleanings. Richardson Depo. 69:5-12, 69:21-70:6. A third patrol deputy does a less-

8    thorough cleaning once a week, although sometimes "other collateral assignments" cause the gun to

9    get dirty more quickly. Schmidt Depo. 66:22-67:13.

10       **D.    Uniform Maintenance and Cleaning**

11       Patrol Deputies and Courtroom Deputies typically wear the standard Class "B" Uniform. The

12   uniform consists of a long or short-sleeve shirt; shoulder patches sewn onto the sleeves; rank

13   insignia (if applicable); badge; nameplate; trousers/skirts; belts; and footgear. Memorandum of

14   Understanding, 2005. They must be in full and proper uniform at the start of each shift. Gattie Depo.

15   38:17-25; Horton Depo. Vol. 1, 128:24-129:7, 149:1-9; Mims Depo. 73:18-23, 74:3-8. They are

16   subject to inspections, both announced and unannounced, at any time. Torres Decl. ¶5. They can be

17   subject to discipline if their uniforms are found to be in unacceptable condition. *Id.*[5]

18       Defendant does not provide washing machines or dryers, nor may deputies pick up or drop

19   off dry cleaning while on duty. Horton Depo. Vol. 1, 142:5-10, 160:13-14; Torres Decl. ¶5. Instead,

20   deputies must take care of cleaning their uniforms during off-duty hours. Capriola Depo. 72:20-

21   73:21; Torres Decl. ¶5. Deputies receive a uniform allowance from Defendant, Bewley Depo. 59:22-

22   64:24, but the parties dispute whether this is meant to compensate deputies for the time spent

23   maintaining their uniforms.

24       No County policy dictates or controls the manner or means by which deputies are to clean

25   and maintain their uniform. Mims Decl. ¶12. Deputies have different cleaning methods and

26   standards of cleanliness, and so their cleaning regimes take different amounts of time. Some deputies

27   take their uniforms to the drycleaners. Epperly Depo. 45:9-46:6; Capriola Depo. 72:20-25;

28

---
[5] Defendant objects to this evidence from Torres Decl. ¶5. This evidence is admissible.

1    Fullenkamp Depo. 15:14-17:16. Other deputies wash and press their own uniforms at home,

2    personally (Richardson Depo. 61:14-62:7; Deimerly Depo. 100:12-104:25) or with the help of their

3    spouse (Marquez Depo. 73:6-15). One deputy spends approximately 14 minutes every two weeks

4    driving to and from the drycleaners. Fullenkamp Depo. 16:14-17:16. Another spends about 60

5    minutes a week washing, pressing, and hanging his uniform, plus 20-40 minutes a week polishing

6    his boots. Richardson Depo. 61:14-63:5. Another spends 30 minutes a day, five days a week, which

7    includes doing his own washing and pressing. Deimerly Depo. 104:16-25. Surveying the

8    declarations, some deputies claim 15 minutes or less per week (15 deputies) while others claim 120

9    minutes or more per week (15 deputies). One declarant claims ten minutes a month on uniform

10   maintenance; another claims 720 minutes a month.

11          **E.**      **Safety Gear Maintenance and Cleaning**

12          Patrol Deputies and Courtroom Deputies are also issued the following safety gear, which

13   they wear in a duty belt: duty weapon and holster, ammunition; two ammunition magazines;

14   handcuffs and handcuffs carrier; collapsible baton and baton holder; flashlight; radio and radio

15   holder; Oleoresin Capsicum ("OC" or "pepper") spray and holder; latex gloves and glove holder.

16   Mims Decl. ¶10; Horton Depo. 57:6-19; Dadian Depo. 36:16-38:4. Deputies may carry from one to

17   four sets of handcuffs. Gattie Depo. Vol. 1, 31:11-14. Deputies may also carry extra ammunition. *Id.*

18   Beginning in approximately 2010, deputies also started carrying Tasers. Torres Decl. ¶ 7 Deputies

19   are also issued ballistic vests, although they are not required to wear these. Mims Decl. ¶11; Horton

20   Depo. 82:24-83:17; Dadian Depo. 39:2-16.

21          No County policy controls how deputies are to maintain their safety gear. Mims Decl. ¶12.

22   Deputy Capriola describes his process as follows. Capriola Depo. 26:14-27:25. He takes his firearm

23   out of its safe. He does a "quick check" to ensure that it is loaded and not malfunctioning, and places

24   it in its holster. *Id*. He straps the duty belt around his waist. *Id*. He shakes the OC spray to make sure

25   it is not empty. *Id*. He checks that his magazines are loaded and that the bullets will come out. *Id*. He

26   takes his flashlight out of its charger and puts it in his belt. *Id*. He takes the radio out of its charger

27   and puts it in his belt. *Id*. He confirms that there are rubber gloves in their pouch. *Id*. Finally, he

28   secures the duty belt using four leather straps called "keepers." *Id*. Another deputy describes how he

1   cycles and oils his handcuffs to make sure they are not rusted or in locked position. Deimerly Depo.

2   109 5:8. Another deputy oils his cuffs "a couple of times a year." Richardson Depo. 64:18. This

3   deputy also checks periodically to make sure his expandable baton is working. *Id.* After deputies

4   started carrying Tasers, one deputy's daily routine includes charging his Taser and performing a dry

5   test to make sure that it is operational. Torres Decl. ¶ 7. Another deputy also tests that the light is

6   working on his gun, makes sure the sights are aligned, and goes through his magazine to make sure

7   all the bullets are in there. Espinoza 56:24-57:2. He also carries a digital tape recorder, which he

8   downloads into the computer to make sure it is fresh. Espinoza 57:8-12. Presumably, any items that

9   are taken out of a safe or a charger are returned at the end of the day.

10          The time it takes deputies to perform their routines varies. According to Deputy Capriola,

11   when everything is working properly, the above-mentioned process takes him five minutes, of which

12   "maybe two" represent the process of donning the belt itself. Capriola Depo. 28:1-4, 30:18-23. His

13   routine also varies depending on the weekday. He goes through "most" of his checks only once a

14   week. Capriola Depo. 28:15-16. Deputy Fullenkamp testified that he maintains his safety gear and

15   duty belt twice a year, and spends approximately 30 minutes a time doing so. Fullenkamp Depo.

16   72:13-74:25. Deputy Deimerly did not testify how frequently he maintains his equipment; when

17   asked how much time he spends doing so "on average per day," he answered five minutes. Deimerly

18   Depo. 108:16-110:11. The declarations underscore the variety in the frequency and duration of these

19   maintenance tasks. Deputies report that they perform maintenance once per year, taking 10 minutes

20   each time; 4 per year, 5 minutes each; 2 per year, 15 minutes each (two deputies), 4 per year, 15

21   minutes each; 4 per year, 20-30 minutes each (three deputies); 12 per year, 5-15 minutes each

22   (fifteen deputies); and 52 times per year, 30 or more minutes each (15 deputies).

23          Plaintiffs offer evidence that deputies may be disciplined if their safety gear is in

24   unacceptable condition. Torres Decl. ¶5[6]; Capriola Depo. 31:15-25. However, there is no policy that

25   requires that this maintenance not be done during the workday, Mims Decl. ¶12, and deputies have

26   done so. Capriola Depo. 31:3-25.

27

28

---

[6] Defendant objects to this evidence from Torres Decl. ¶5. This evidence is admissible.

## II.   Legal Standard

The FLSA requires employers to pay overtime to all covered employees for hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1). Employees may sue collectively, on behalf of employees who are "similarly situated." 29 U.S.C. § 216(b). Defendants have moved to decertify this collective action, and Plaintiffs now bear the burden to provide substantial evidence that they are in fact "similarly situated." *Reed v. County of Orange*, 266 F.R.D. 446, 449-50 (C.D. Cal. 2010). Substantial evidence is "such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Lambert v. Ackerley,* 180 F.3d 997, 1012 (9th Cir.1999).

### A.   Definition of "Similarly Situated"

The FLSA does not define the term "similarly situated," and there is no Ninth Circuit precedent interpreting the term. *Reed*, 266 F.R.D. at 449-50; *see also Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir.2001) ("Unfortunately, [Section] 216(b) does not define the term 'similarly situated' and there is little circuit law on the subject.").

Courts consider various factors in deciding whether claimants are "similarly situated." "These factors include: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Reed*, 266 F.R.D. at 449-50.

In considering the first factor, Plaintiffs' factual and employment settings, the "key issue" is whether Defendant had "a common, *de facto* policy of permitting off-the-clock work." *Smith v. Micron Electronics Inc.*, 2005 WL 5336571 (D. Idaho Feb. 4, 2005). This need not be a formal, written policy; what is needed is some organization-wide "factual or legal nexus." *Id*. This may be a custom, scheme, policy, decision, plan, or practice. See *Reed*, 266 F.R.D. at 450 ("single policy, custom or practice"); *Smith*, 2005 WL 5336571 ("plan … decision, policy, or practice"). In considering the second factor, Defendant's ability to defend or rebut individual claims, the Court must take into account the various elements of the FLSA claim, described below. In considering the third factor, fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to

1  limit the controversy to one proceeding which efficiently resolves common issues of law and fact

2  that arose from the same alleged activity. The Court must also determine whether it can coherently

3  manage the class in a manner that will not prejudice any party. *Reed*, 266 F.R.D. at 462.

4          **B.     The Elements of an FLSA Claim**

5          The elements of a claim for overtime compensation under 29 U.S.C. § 207(a)(1) are as

6  follows. First, each activity must constitute "work." That is, it must be undertaken for the benefit of

7  the employer and controlled or required by the employer. *Bamonte v. City of Mesa*, 598 F.3d 1217,

8  1224-25 (9th Cir. 2010). If performed outside the scheduled work time, then (under the Portal-to-

9  Portal Act, 29 U.S.C. § 254(a) (2012)) it must also be an integral and indispensable part of the

10  employee's principal activities. *Id.* Second, Plaintiffs must have been "employed" ("suffered" or

11  "permitted") to do the work, and the employer knew or should have known they were working.

12  *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). Finally, the hours of

13  work performed must be actually, rather than theoretically, compensable. To be compensable, the

14  amount of time claimed must be reasonable in relation to the principal activity and not *de minimis*.

15  *Bull v. United States*, 68 Fed. Cl. 212, 220-21 (Fed. Cl. 2005); *see also* 29 C.F.R. § 785.47.

16          The definition of when work is *de minimis,* and exempt from pay, has evolved since the

17  Supreme Court first discussed the concept. As the Court first explained, employers need not pay for

18  activities that are insignificant in duration—"split-second absurdities" that "are not justified by the

19  actuality of the working conditions." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 692

20  (1946). Most federal courts after *Anderson* have found that this rule encompasses a time period of

21  ten minutes or less per day. *Musticchi v. City of Little Rock, Ark.*, 734 F. Supp. 2d 621, 632 (E.D.

22  Ark. 2010).

23          However, as the Ninth Circuit has explained, the *de minimis* test today reflects a "balance"

24  between this principle and the principle that an employer must pay for activities it requires of its

25  employees. *Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1057 (9th Cir. 2010). Employers must pay for

26  "even small amounts of daily time" if it can be calculated in the aggregate, taking into account the

27  challenges in measuring both the duration and the frequency of the task. *Lindow v. United States*,

28  738 F.2d 1057, 1063 (9th Cir. 1984) (considering (1) the practical administrative difficulty of

1    recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity

2    of the additional work); *Rutti*, 596 F.3d at 1057.

3          Plaintiffs may be owed the amount of their unpaid overtime compensation, plus reasonable

4    attorneys' fees and costs. 29 U.S.C. § 216(b). They also may be entitled to "an additional equal

5    amount as liquidated damages." *Id.* The Court, in its discretion, may mitigate or deny liquidated

6    damages if the employer shows that he acted in good faith and had reasonable grounds for believing

7    he was not violating the FLSA. 29 U.S.C. § 260; *see also Bull*, 68 Fed. Cl. at 274-75.

8    **III.   Analysis**

9          **A.     Duty Weapon Qualification**

10               **1.     Defendant Had a *De Facto* Policy To Deny Overtime Pay for Weapons**

11                        **Qualification**

12         In briefing, Defendant argues that Plaintiffs' weapons qualification claim must be decertified

13   because Plaintiffs cannot show a "single unified policy" requiring that this work be done off-duty.

14   This misstates Plaintiff's burden. As explained above, Plaintiffs must show that they are similarly

15   situated; one factor in this showing is the disparities in the factual and employment settings of the

16   individual plaintiffs; and the "key issue" underlying this factor is whether Defendant had a common,

17   *de facto* policy of permitting off-the-clock work, where "policy" is variously explained to include a

18   custom, scheme, policy, decision, plan, practice, or other organization-wide "factual or legal nexus."

19   Thus, failure to show a "single unified policy" does not defeat certification. Plaintiffs rely on a

20   quotation from *Reed v. County of Orange* which, when read in context, was clearly not meant to part

21   with this consensus among courts who have considered the issue.

22         As Defendant observes, Plaintiffs are seeking overtime in this litigation for work that they

23   never submitted in their timesheets. In Defendant's view, this too is fatal to their claim, because

24   under Defendant's written policies, overtime payment requires supervisor approval. But substantial

25   evidence in the record, as well as common sense, makes it clear why deputies did not request

26   approval: They knew that the request would be denied. Granted, there is not strong evidence that

27   supervisors explicitly announced this policy, and certainly not enough to show a *de facto* policy

28   denying pay for weapons qualification. *See Smith*, 2005 WL 5336571 (class decertified, where

Plaintiff failed to show that all, or even a majority, of thirty-one supervisors implemented a *de facto* policy of permitting off-the-clock work); *Basco v. Wal–Mart Stores, Inc.,* 2004 WL 1497709, at *6–7 (E.D.La. July 2, 2004) (declining to certify class when evidence of policy requiring off-the-clock work consisted of statements from one manager rather than all managers, and when requirement of off-the-clock work occurred only once or twice during a plaintiff's employment). But in this case, Defendant describes an informal process by which deputies learn what overtime will be permitted: they must ask their sergeant, or learn through time, experience, and training, or "basically know." Horton Depo. Vol. 2, Ex. HH 246:4-14. The Court therefore credits deputies who did not learn directly from supervisors that overtime requests for weapons qualification would be rejected. Deimerly Depo. 115:19-25 (asked other deputies); Marquez Depo. 31:23-32:3 (just knew). Plaintiffs have also provided evidence that Defendant was aware that deputies were qualifying after-hours, in that the range master, Deputy Frascona, described this issue to now-Captain Dadian. Defendant cannot hide behind the fact that Plaintiffs did not ask for overtime, when it knew that deputies were doing after-hours work and when it created an environment where deputies decide for themselves whether requesting overtime for this work would be futile. *Cf. Frank v. Gold'n Plump Poultry, Inc.,* 2007 WL 2780504 (D. Minn. Sept. 24, 2007) (a "policy not to have a policy" can be as pernicious as a policy; employer knew that supervisors were wrongly failing to authorize overtime yet decided not to create a policy instructing them to change that practice).

Observing that Plaintiffs did not request these hours as overtime, Defendant also argues that Plaintiffs therefore cannot establish that Defendant knew that this overtime occurred. Defendant seems to suggest that there is a *per se* requirement that an employee must submit his overtime hours. Doc. 174-1 ("Where a Plaintiff seeking overtime compensation under the FLSA has ignored his employer's requirements regarding pre-approval of overtime and has not reported the additional time worked, that time is not compensable.") This argument was more appropriately raised by Defendant in its motion for summary judgment. The Court rejects it again because the cases cited by Defendant do not stand for that proposition. Under *Newton v. City of Henderson*, even if an employee did not report hours in his time sheets, he can still demonstrate constructive knowledge by showing that the employer should have known that the employee worked more hours than those claimed on his time

sheets. *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (discussing *Forrester*, 646 F.2d at 414 (9th Cir.1981)). *Gaylord v. Miami-Dade County* was also a case in which the employer lacked both actual and constructive knowledge of Plaintiff's claimed work. *Gaylord v. Miami-Dade County*, 78 F. Supp. 2d 1320, 1325 (S.D. Fla.1999). In *Gaylord*, a sergeant of a traffic squad claimed that his supervisor orally directed him to supervise and be responsible for the Transit Squad "at all times," and that as a result he worked some 127 hours a week over a span of almost two years. The court balked, noting that his employer had no way of knowing that this work had occurred; in addition to not submitting overtime requests, Gaylord did the majority of this alleged work at home.

### 2.   <u>Although Some Deputies Did Overtime Work, They Are Not Similarly Situated</u>

Plaintiffs have thus identified *de facto* policy of not compensating overtime. Where they fail, however, is in identifying any *de facto* policy that requires them to work overtime in the first place. Deputies can and do qualify their weapons during the work day. Even those deputies who qualify overtime do most of their qualifications during the workday. Out of 196 total non-representative Plaintiff's declarations, only 20% qualified off-the-clock at least once per year.

Plaintiffs argue that employees are not truly allowed to work during the workday if they are not provided time to do so. But Defendant does provide deputies with time. Sometimes there were time conflicts; deputies who could not qualify during their shifts were entitled to overtime pay. The problem lies in identifying who these deputies are. Some deputies qualified overtime out of personal preference: out of the ten Plaintiffs deposed, only four qualified after hours for reasons that might support overtime payment. Other deputies may not have made sufficient efforts to secure a time to qualify. Defendant is entitled to individualized discovery on these points.

Plaintiffs ask the Court to direct its inquiry not at "the duties of the individual Plaintiffs" or at "what shifts the Plaintiffs worked," but instead at the "off-the-clock activities" themselves. In short, Plaintiffs suggest that they are similarly situated because the activity of certifying a weapon is the same for all of them, and that any disparities between deputies, in terms of why or how often they qualify, are only evidence of damages. Accordingly, Plaintiffs propose subgrouping deputies by category (courtroom, patrol, detective), or else bifurcating into liability and damages phases, using

representative testimony wherever it is appropriate. *See Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 382-83 (W.D. Pa. 2011) ("the prospect of individualized damages defenses should not preclude collective adjudication of the critical issue in this case—whether Defendant employed 'an improper practice that was formulated centrally and resulted in uncompensated overtime'"); *see also Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 933-34 (S.D. Tex. 2009) (describing procedural options).

Plaintiffs are correct that a variation in the amount of overtime worked does not necessarily mean that Plaintiffs are not similarly situated. Sometimes it reflects only a difference in damages, which a court may be able to manage using one of the procedures suggested by Plaintiffs. But sometimes the difference in damages is symptomatic of the fact that Plaintiffs are truly not similarly situated. See *Reed*, 266 F.R.D. at 458 (C.D. Cal. 2010) (relying on expert who concluded that "the average number of missed meals is not a good measure for inferring individual experience because the variation is so large"). Here, some deputies who qualified after-hours were not entitled to overtime pay, either because they did so out of personal preference or because they did not avail themselves of opportunities to do their work during the workday. Individualized discovery is necessary to sort out these deputies from the ones who are entitled to overtime pay. Plaintiffs are not similarly situated as to this claim. The motion to decertify this claim is granted.

### B.    Duty Weapon Cleaning—Quarterly

Because deputies clean their weapons whenever they qualify, the outcome of this claim must follow Plaintiffs' weapons qualification claim. The motion to decertify is granted.

### C.    Duty Weapon Cleaning—More Than Quarterly

Plaintiffs also claim overtime for having to clean their weapons outside of the quarterly weapons qualifications.

The Second Amended Complaint broadly states a claim for "cleaning and maintenance of ... firearms." Doc. 27. Prior to this point in the litigation, it was not clear to the Court to what extent Plaintiffs sought compensation for weapons maintenance occurring more-than-quarterly. Doc. 156. In their motions for summary judgment, neither party presented evidence concerning the duration or frequency of such additional maintenance. *Id.*

Now, at decertification, the parties again identify little evidence regarding this claim. The declarations of the opt-in Plaintiffs included time spent "maintaining my firearm," but the parties do not refer to these declarations. The answers would be of limited usefulness in any event. Deputies state the duration and frequency of their weapons maintenance, but they do not distinguish what that maintenance consisted of. This creates confusion, because there are a variety of ways to clean a weapon, ranging from a wipe-down, Deimerly Depo. 125:22, to a messy cleaning requiring materials and equipment that the Department only provides at the range, Frascona Decl. ¶4. This confusion limits Defendant's ability to exercise its *de minims* defense for maintenance that may not have been compensable.

Worse, there is no telling whether some deputies understood the phrase "maintaining my firearm" even more broadly, to include activities that other deputies view as maintenance of safety gear. One deputy, for example, blurred this line in his deposition, describing as part of his daily safety gear maintenance routine what is arguably weapon maintenance: testing that the light is working on his gun, making sure the sights are aligned, and going through his magazine to make sure all the bullets are in there. Espinoza Depo. 56:24-57:2. This possible over- or under-inclusiveness creates a risk of unfairness to both Defendant and Plaintiffs, in that some deputies might be compensated for the same act twice, or potentially not at all.

Setting aside these concerns with the evidence, the existing evidence is insufficient to show that Plaintiffs are similarly situated. Deputies do not clean their weapons a predictable number of times. A gun may become dirty because a deputy executes a search warrant, chases a suspect through a vineyard, or simply stays inside the office. By itself, this would be an issue with damages. However, each deputy has his own standard of cleanliness and his own preferred manner of cleaning. *See e.g.* Epperly Depo, 26:18-23 ("I do a thorough job, slow, meticulous … I spend probably a few more minutes than the average deputy does cleaning a weapon."); s*ee also Reed*, 266 F.R.D. at 456 (decertifying claims that "depend heavily on [deputies'] job assignment and personal habit"). It is not that firearm maintenance claims are inherently unsuitable for collective action. *See e.g. Bull*, 68 Fed. Cl. 212 (awarding damages based on representative testimony at trial). But *Bull*

assumed a class that had previously been certified, and does not help show why a class should be certified here.

Plaintiffs urge the Court to use representative testimony to establish either a reasonable frequency or a reasonable duration of cleaning. This mechanism adds some amount of fairness, because it avoids rewarding people who took longer to do a task than they should have, or punishing people who completed a task more efficiently than their peers. *See Bull*, 68 Fed. Cl. at 280 ("[p]laintiffs are entitled to payment for that amount of time reasonably required" to accomplish a task); *see also Musticchi*, 734 F. Supp. 2d at 635 (at summary judgment, court relies on representative testimony to determine a minimum time for firearm maintenance).

But representative testimony is not appropriate where defendants are not similarly situated. Here, there is no reasonable time or frequency for the task in question. Each deputy's weapon will accumulate dirt at a materially different rate and in a materially different way, and each deputy will clean it according to his subjective preference. In this situation, paying each Plaintiff a "reasonable" amount has its unfair side as well, rewarding individuals who did less work and punishing those who did more. Decertifying this claim, and allowing Defendant to conduct individualized discovery, will ensure that deputies are only paid for overtime work that they actually did.

The motion to decertify this claim is granted.

**D.    Uniform Maintenance and Cleaning**

Next is Plaintiffs' uniform maintenance claim. As a preliminary matter, although Plaintiffs point out that uniform maintenance is work, *Albanese v. Bergen County, N.J.*, 991 F. Supp. 410, 420-21 (D.N.J. 1997), it is not necessarily compensable under the Portal-to-Portal Act. Several cases have considered this question. See *Attanasio v. Cmty. Health Sys., Inc.*, 863 F. Supp. 2d 417, 426-29 (M.D. Pa. 2012) (collecting cases); *compare Mory v. City of Chula Vista*, 07-CV-462 JLS WVG, 2010 WL 3748813 (S.D. Cal. Sept. 24, 2010) (finding issue of material fact whether police academy recruit is entitled to compensation for time spent maintaining her uniform) *with Schwartz v. Victory Sec. Agency, LP*, 11CV0489, 2011 WL 2437009 (W.D. Pa. June 14, 2011) (under Portal-to-Portal Act, wearing and therefore maintaining uniforms was not integral and indispensable to security

1   guards' principal activity, providing security). However, the parties have not raised the question, and

2   the Court does not address it.

3   **1.     Factual and Employment Settings**

4   Defendant has a *de facto* policy to not pay for time spent cleaning uniforms. In addition,

5   Plaintiffs all wear the same uniform. However, despite these commonalities, there are also

6   significant differences between Plaintiffs. For some, the work consists in driving to and from a dry

7   cleaner; for others, it consists in laundering and pressing the uniform. Some deputies may have used

8   the time cleaning their uniforms to clean personal clothing. Finally, Defendant points to the large

9   disparity in time and frequency that Plaintiffs claim for maintaining their uniforms. At the far

10  extreme, some did no work—their spouses did the work.

11  Certainly, it is significant that Plaintiffs' uniforms are the same. Other cases have decertified

12  uniform maintenance claims, at the less exacting stage of conditional certification, in part because

13  the plaintiffs wore different uniforms. *See Williams v. Securitas,* 2011 WL 3629023, at *5–6

14  (security guard employees wear a variety of uniforms depending on client, suggesting that time

15  involved in cleaning will vary from guard to guard); *Hall v. Guardsmark, LLC*, CIV.A. 11-213, 2012

16  WL 3580086 (W.D. Pa. Aug. 17, 2012) (named plaintiffs do not concur about the uniforms they

17  wore or the maintenance required of them). Although there are differences in how deputies wear

18  their uniforms, *Mims Decl.* ¶4, these variations are not material by themselves. *See Reed*, 266 F.R.D.

19  at 463-64 (in context of donning and doffing claim, variations in how deputies wear uniforms not

20  material). Detective deputies have their own peculiar uniform habits, but these can be

21  accommodated by creating a subclass for detective deputies. *Russell v. Illinois Bell Tel. Co., Inc.*,

22  721 F. Supp. 2d 804, 812-13 (N.D. Ill. 2010) (discussing the use of subclasses in FLSA cases).

23  Nevertheless, the evidence shows that Plaintiffs' factual and employment settings are too

24  disparate on this point. It is significant that Plaintiffs may use the time maintaining their uniforms to

25  also clean personal items of clothing. *See Hawkins v. Securitas Sec. Services USA, Inc.*, 280 F.R.D.

26  388, 401 (N.D. Ill. 2011) (whether time maintaining uniform is compensable depends in part on

27  whether uniform may be washed and dried with other garments, by analogy to 29 C.F.R. §

28  4.168(b)(1), which discusses costs of maintaining uniform). Plaintiffs' claim is also harmed by the

17

broad range in time and frequency, including cases where a spouse does the work and the employee suffers no damages at all. The Court agrees with Defendant that this is more than an issue of damages; it is symptomatic of other differences. Like their firearms, deputies' uniforms get dirty at different rates, and deputies have subjective preferences as to how and how often to clean them. *See Hawkins*, 280 F.R.D. at 400-01; *Williams*, 2011 WL 3629023 (conditional certification denied, where the frequency with which uniforms are cleaned and ironed is entrusted to the individual employee's discretion and, as a result, varies from employee to employee).

## 2.   **Individualized Defenses**

In determining whether Plaintiffs are "similarly situated," the Court also considers whether a collective action would prejudice Defendant's ability to assert defenses against individual deputies. Defendant asserts the *de minimis* defense in particular. The defense turns on three factors: practical administrative difficulty in recording additional time; aggregate compensable time; and regularity of additional work. *Lindow*, 738 F.2d at 1063. To support its *de minimis* argument, Defendant points to the duration, regularity, and manner with which Plaintiffs clean their uniforms. In short, Defendant wishes to investigate how much work each Plaintiff did.

Courts have found that the *de minimis* issue can support a finding of decertification, but they have not always been clear in their reasoning. At one extreme, *Hawkins* decertified a claim for pre-shift work simply because there was variation among individual security guards in how early they arrived and how often they did so. The court did not discuss its application of the *de minimis* defense at length, except to say that the defense goes "to liability, not damages." *Hawkins*, 280 F.R.D. at 400-01. Other courts, however, acknowledge that the defense can go to damages, not liability. *See Russell*, 721 F. Supp. 2d at 820-21; *see also Andrako*, 788 F. Supp. 2d at 382 (*de minimis* defense as asserted by parties "relate[s] primarily to damages"). The best approach seems to be to look past the extreme language to the facts. For example, Defendant points to *Reed*, a case which stated that the *de minimis* defense is individualized "by [its] nature." *Reed*, 266 F.R.D. at 460 (citing *Smith v. T-Mobile USA, Inc.*, 2007 WL 2385131, at *8 (C.D.Cal. Aug.15, 2007)). However, the *Reed* court also based its decision to decertify on the "highly" individualized nature of the claims: for some Plaintiffs, "as many as thirty different sorts of pre-shift activities and at least twenty-five assorted

18

post-shift activities." *Reed*, 266 F.R.D. at 453. The *de minimis* defense would not have even been

meaningful because the various plaintiffs' claims were like apples and oranges; the court was "hard-

pressed to imagine how a trial could proceed in any sort of manageable fashion where so many of

the claims must be rebutted by individualized evidence." *Id.* at 462. By contrast, where there is less

variation, the *de minimis* defense is susceptible of classwide resolution, such as by determining "how

much time is *de minimis* as a matter of law and what characteristics time must have before it can be

considered *de minimis*." *Andrako*, 788 F. Supp. 2d at 382 (declining to decertify for *de minimis*

defense based on variations in walking time on a factory floor); *see also Maynor v. Dow Chem. Co.*,

671 F. Supp. 2d 902, 933-34 (S.D. Tex. 2009) (courts in FLSA cases routinely bifurcate the issue of

damages).

　　　　　Considered on balance, this defense weighs slightly in favor of decertification. Of the three

factors in the *de minimis* analysis, the second factor (aggregate amount of compensable time) can be

adequately addressed in a collective action. Although some deputies may have spent mere "trifles"

of time maintaining their uniforms, *Anderson*, 328 U.S. at 692, and although different deputies spent

different amounts of time on their uniforms, neither fact prejudices Defendant's ability to assert this

defense. At the damages stage, Defendant can raise its *de minimis* defense as a cutoff below which

claims will not be paid. However, decertification would assist Defendants in addressing the first and

third factors (i.e., the practical administrative difficulty of recording the additional time, and the

regularity of the additional work). There are obvious practical limits to recording the uniform

maintenance that each employee did. This is because uniform maintenance may be done at home or

at a dry cleaner or laundry (for which driving times vary); by oneself or by a spouse; with or without

one's personal clothes; and at frequency varying based on exposure to dirt and preferences for

cleanliness. Proceeding collectively will prejudice Defendant's ability to investigate and defend

against these individualized issues.

### 3. **Fairness and Procedural Considerations**

　　　　　Many features of proceeding collectively are salutary and argue in favor of coverage. "The

purpose of a collective action is to allow plaintiffs the advantage of lower individual costs to

vindicate rights by the pooling of resources. For many plaintiffs, a collective action is the only

1    practical method of adjudicating their FLSA claims." *Nerland v. Caribou Coffee Co., Inc.*, 564 F.

2    Supp. 2d 1010, 1025 (D. Minn. 2007) (citations, quotations, and ellipses omitted). Decertification

3    can be a hardship for Plaintiffs and for the Court, "placing each opt-in plaintiff back at square one,

4    without the benefit of pooled resources, and presenting the Court with [a large number of] separate

5    lawsuits to resolve the same question." *Id.* at 1026. Even the defendant's "right to defend against

6    individualized claims on an individual basis" must be "balanced with the rights of the plaintiffs—

7    many of whom would likely be unable to bear the costs of an individual trial—to have their day in

8    court." *Id.*

9         Despite these considerations, the fair way to proceed is through decertifying this claim. The

10   Plaintiffs are actually doing different work. It would not be fair to pay a minimum amount, because

11   so many people did more; it would not be possible to estimate a "reasonable" amount or an amount

12   required by the employer, because there is so much diversity in how much work people do, based

13   partly on people's own preferences.[7]

14        **E.        Safety Gear Maintenance and Cleaning**

15        Plaintiffs' final claim is for safety gear maintenance and cleaning. First, Plaintiffs fail to

16   identify any common *de facto* policy. There may be a requirement that deputies maintain their safety

17   gear, Torres Decl. ¶5; Capriola Depo. 31:15-25, and Defendant apparently does not pay for

18   performing these tasks after-hours. However, Plaintiffs fail to identify any common *de facto* policy

19   that forbids payment for doing this work during the workday, and it is unclear why they cannot do

20   so. *See* Capriola Depo. 31:3-25. Some of these tasks can obviously be done during the workday—

21   shaking the OC spray, confirming that one has rubber gloves, confirming that the handcuffs are in

22   the "unlocked" position. Other tasks perhaps cannot be done during the workday (removing one's

23   flashlight, Taser, and radio from the charger, and one's firearm from the safe; securing the keepers

24   on one's duty belt), but these tasks overlap with the donning and doffing claims, which the Court

25   found were barred by the Portal-to-Portal Act. Indeed, Deputy Capriola stated that two of the five

26   minutes that he at first attributed to maintaining his safety gear are actually attributable to donning

27   the belt itself. Capriola Depo. 28:1-4, 30:18-23.

28

---

[7] Defendant objects to evidence from Henderson Decl. ¶17. This evidence is inadmissible hearsay.

There are other material differences in Plaintiffs' factual and employment settings. The depositions show a great variability in time and frequency of these maintenance activities. The highest claim represents at least thirty minutes each week (fifteen deputies); the next-highest is by represents five to fifteen minutes each month (fifteen deputies). These numbers also raise the importance of Plaintiffs' *de minimis* defense: these two claims represent, respectively, six minutes per workday and less than a half minute per workday. And these numbers may already be inflated, to the extent that they represent donning-and-doffing activities, which the Court has already ruled are not compensable. In *Valladon v. City of Oakland*, the court held that when considering the *de minimis* defense at summary judgment, it would not consider each activity in isolation (checking pepper spray, checking handcuffs, etc.), but should add all these numbers together. *Valladon v. City of Oakland,* 2009 WL 2591346 (N.D. Cal. Aug. 21, 2009). Even following *Valladon*, the total amounts are *de minimis*.

These numbers do not justify bifurcating damages. These disparities in time and frequency reflect the fact that Plaintiffs are given no guidance on how to maintain their gear, allowing them to do so in the way that they see fit. Decertification, though difficult to Plaintiffs, is fair since it assures that Plaintiffs are not compensated for work that is not required of them by their employer.

**IV.   Order**

For the foregoing reasons, it is hereby ORDERED that Defendant County of Fresno's Motion for Decertification of Collective Action (Doc. 174) is GRANTED in full. With the exception of the lead Plaintiffs in this action, all other Plaintiffs' claims are severed from this action and dismissed without prejudice to each Plaintiff filing a separate action for his or her claim. If any severed plaintiff files an individual action, it is to be randomly assigned. To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statutes of limitations for 30 days after the entry of this Order.

IT IS SO ORDERED.

Dated:   **March 23, 2013**                        **/s/ Sandra M. Snyder**
                                                        UNITED STATES MAGISTRATE JUDGE